IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GEORJANE BRANHAM,<br><br>                    Plaintiff,<br><br>v.<br><br>DELTA AIRLINES AND JONI GAGNON,<br><br>                    Defendant. | MEMORANDUM DECISION AND ORDER ON SUMMARY JUDGMENT<br><br><br><br>Case No. 2:14-CV-429 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendants' Motion for Summary Judgment. Defendants seek summary judgment on all claims. Also before the Court is Plaintiff's Motion for Summary Judgment. Plaintiff seeks summary judgment on her FMLA claim. For the reasons discussed below, the Court will grant Defendants' Motion and deny Plaintiff's Motion.

## I.  BACKGROUND

Plaintiff Georjane Branham worked for Delta as a flight attendant since 1991. On July 26, 2010, Plaintiff tried to report for duty and board a Delta flight with a blood-alcohol level of 0.049. A confirmation test conducted twenty minutes later revealed a blood-alcohol level of 0.041. Delta policy prohibited employees in a position requiring the performance of safety-sensitive functions, like flight attendants, from reporting for duty with an alcohol concentration of 0.02 of greater.

As a result of this incident, Plaintiff's employment with Delta was terminated on July 26, 2010. Plaintiff was ultimately reinstated after completing an alcohol rehabilitation program. Plaintiff returned to work on September 14, 2010, and was placed on "Final Warning" due to her

positive random alcohol test.  Plaintiff was warned that "[a]ny infraction of Company policy or failure to meet Company standards will result in a recommendation for termination of your employment."[1]  Plaintiff's "Final Warning" status remained in effect throughout her career.

On January 24, 2012, Plaintiff incurred an "occasion of absence" when she missed work due to illness.  On April 2, 2012, Plaintiff incurred another occasion of absence after missing several days of work due to illness.[2]  Plaintiff incurred other absences during the relevant period. The parties dispute whether those absences were considered by Delta in deciding to terminate Plaintiff.  That dispute is immaterial to the Court's determination.

Plaintiff was scheduled for A-Days (access days) from June 6, 2012, through June 8, 2012.  A-Days refer to three days per month when flight attendants do not have an assigned trip but are instead on call.  Delta's absence notification policy differs based on whether a flight attendant has an assigned trip (a trip holder) or is on A-Days.  Under both situations, a flight attendant must notify the Management Support Team as soon as he or she is aware of their inability to cover an assignment.[3]  A trip holder "must call 3 hours prior to scheduled report time" and if a trip holder calls "in less than 3 hours prior to report time, your schedule will be marked CFSM and you will be subject to administrative action."[4]  The policy for A-Days is different.  The policy relevant here states: "If you call in sick on the day of the assignment after

---

[1] Docket No. 21 Ex. 10.

[2] Plaintiff contends that this occasion of absence should have been considered FMLA. However, Plaintiff did not apply for FMLA for this absence until after she was suspended pending termination and her claim was ultimately denied for late reporting.

[3] Docket No. 21 Ex. 14.

[4] *Id.*  CFSM means the flight attendant must contact their Field Service Manager to be cleared for future work.

accepting the assignment . . . your schedule will be marked with CFSM and you will need to contact your Field Service Manager."[5]

During an A-Days period, on June 7, 2012, Plaintiff learned that she was assigned a trip the following day.  At 11:30 p.m., Plaintiff called flight scheduling to confirm her schedule for the next day and accepted her assignment for 6:00 a.m. the next morning.  A little over two hours later, at 1:55 a.m., Plaintiff called scheduling to request a managed time out ("MTO").  Plaintiff explained that her mother was "really sick" and that she did not "feel capable of flying."[6] Plaintiff was informed that since she was on A-Days, her absence would be marked CFSM.  In a follow-up email to Plaintiff's supervisor, Joni Gagnon, scheduling stated that Plaintiff called out on A-Days and was "CFSM due to failure to cover rotation."[7]  When given a failure to cover on a Final Warning, a flight attendant can be terminated.

Plaintiff emailed Ms. Gagnon on June 8, 2012, at 9:05 a.m.  Plaintiff stated that her "mother was very ill" and explained that Plaintiff had been taking care of her and the woman she lived with.[8]  Plaintiff stated that she "was still up and caring for my mother at 1:55 am realizing I had to wake up in 2 hours and felt unfit to fly due to fatigue."[9]  Plaintiff apologized and stated she had made arrangements for care for her mother and "would be happy to go back on call asap to help our operations."[10]  Ms. Gagnon did not offer Plaintiff FMLA leave at that time.  While

---

[5] *Id.*

[6] *Id.* Ex. 18.

[7] *Id.* Ex. 19.

[8] *Id.* Ex. 20.

[9] *Id.*

[10] *Id.*

Ms. Gagnon initially cleared Plaintiff for work, Plaintiff was held out of service after June 8, 2012.

After a review of her employment, Delta's In-Flight Service recommended that Plaintiff's employment be terminated and Delta's Human Resources department supported that recommendation.  Plaintiff's employment was terminated effective July 5, 2012.  Plaintiff appealed her termination through Delta's Conflict Resolution Process.  At the end of that process, Plaintiff's termination was upheld.  Plaintiff then appealed that decision two more levels.  Each time the decision to terminate was upheld.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11]  In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[12]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[13]

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[14]  "When the parties file cross motions for summary judgment, 'we are entitled to assume that no evidence needs to be considered other than that filed by the

---

[11] Fed. R. Civ. P. 56(a).

[12] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[13] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[14] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

Case 2:14-cv-00429-TS   Document 35   Filed 04/26/16   Page 5 of 22

parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'"[15]

## III.  DISCUSSION

Plaintiff's First Amended Complaint asserts the following causes of action: (1) violation of the Family and Medical Leave Act ("FMLA"); violation of the Employee Retirement Income Security Act ("ERISA"); breach of contract; breach of the covenant of good faith and fair dealing; violation of the Americans with Disabilities Act ("ADA"); and violation of the Age Discrimination in Employment Act ("ADEA").  Plaintiff has conceded her ADEA claim and it will not be discussed.  Plaintiff's remaining claims are addressed below.

## A.    DISABILITY DISCRIMINATION

### 1.    Timeliness

Defendants first argue that Plaintiff's discrimination claim is barred because she did not timely file a charge of discrimination.

A charge of discrimination filed under the ADA must comply with the timing requirements of Title VII.  Title VII provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .[16]

---

[15] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David D. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

[16] 42 U.S.C. § 2000e-5(e)(1).

The facts related to this issue are undisputed.  Plaintiff was terminated on July 5, 2012.
Plaintiff first filed an Intake Questionnaire with the Equal Employment Opportunity Commission
("EEOC") on April 10, 2013, more than 180 days but less than 300 days after her termination.[17]
Later, Plaintiff filed a formal charge of discrimination with the EEOC on June 4, 2013.[18]  The
charge was later transmitted to the Utah Anti-Discrimination and Labor Division ("UALD").[19]
Defendants argue that, even considering the earlier Intake Questionnaire, Plaintiff's
discrimination claim is untimely because she did not initially institute proceedings with the
UALD.[20]

    "In states in which a state agency has authority to investigate employment discrimination
('deferral states'), Title VII requires claimants to file a charge of discrimination within 300 days
of the alleged unlawful employment practice.  Utah is a deferral state."[21]  Thus, Plaintiff could
take advantage of the longer filing period if she initially instituted proceedings with the UALD.
Defendants argue that Plaintiff cannot because she never filed a charge with the UALD.

    The question presented is whether, despite only filing a charge of discrimination with the
EEOC, Plaintiff nevertheless initially filed a charge with the UALD.  Those courts that have
considered the issue have held that a charge "is 'initially filed' with the deferral-state agency,
even though it was actually filed first with the EEOC, where the EEOC and the deferral-state

---

[17] Docket No. 21 Ex. 38.

[18] *Id.* Ex. 37.

[19] *Id.* Ex. 39.

[20] Defendants do not contend that Plaintiff's Intake Questionnaire was not sufficient to constitute a charge of discrimination.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 404 (2008).  The Court will assume for the purposes of this Motion that Plaintiff's Intake Questionnaire did constitute a charge of discrimination.

[21] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003).

agency agree to act as agents for each other in the filing of charges of discrimination pursuant to a Work-Sharing Agreement."[22]

The UALD has a work-sharing agreement with the EEOC.[23]  Neither party provided the Court with a copy of that agreement.  However, it is reasonable to assume that the agreement is similar to the Model Work Share Agreement prepared by the EEOC.[24]  That agreement states, in pertinent part:

> In order to facilitate the assertion of employment rights, the EEOC and the FEPA [Fair Employment Practices Agency] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges. The EEOC's receipt of charges on the FEPA's behalf will automatically initiate the proceedings of both the EEOC and the FEPA for the purposes of Section 706(c) and (e)(1) of Title VII.  This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge.  Charges can be transferred from one agency to another in accordance with the terms of this agreement or by other mutual agreement.[25]

Thus, Plaintiff's filing of her charge with the EEOC automatically initiated the proceedings in both the EEOC and the UALD.  Defendants do not address any of the cases cited by Plaintiff and merely cite a Tenth Circuit case for the general proposition that "[i]n states with a state agency that has authority over employment discrimination claims . . . employees have up

---

[22] *Millage v. City of Sioux City*, 258 F. Supp. 2d 976, 985 (N.D. Iowa 2003) (citing *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 326–28 (2d Cir. 1999)); *see also Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 277 & n.13 (1st Cir. 2014) (collecting cases and joining those circuits in holding that "worksharing agreements can permit state proceedings to be automatically initiated when the EEOC receives the charge").

[23] Utah Code Ann. § 34A-5-107.

[24] U.S. Equal Employment Opportunity Commission, FY 2012 EEOC/FEPA Model Worksharing Agreement, http://www.eeoc.gov/employees/fepa_wsa_2012.cfm.

[25] *Id*. § II, ¶ A; *see also Millage*, 258 F. Supp. 2d at 985–86 (discussing similar language in work sharing agreement between EEOC and Iowa Civil Rights Commission).

to 300 days to file an EEOC charge if they first file a charge with the state agency."[26]  However,

the case cited by Defendants does not address the issue before the Court of whether filing only

with the EEOC accomplishes this requirement.  As stated, the courts that have addressed the

issue have rejected Defendants' argument.  Therefore, the Court finds that Plaintiff's

discrimination claim is timely and the Court will proceed to a discussion of the merits.

    *2.    Merits*

"[I]n order to establish a prima facie case of disability discrimination under the ADA, a

plaintiff must demonstrate that [s]he (1) is a disabled person as defined by the ADA; (2) is

qualified, with or without reasonable accommodation, to perform the essential functions of the

job held or desired; and (3) suffered discrimination by an employer or prospective employer

because of that disability."[27]  "In order to demonstrate 'discrimination,' a plaintiff generally must

show that he has suffered an 'adverse employment action because of the disability.'"[28]

"If a plaintiff offers no direct evidence of discrimination, which is often the case, the

court applies the burden-shifting analysis articulated by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green.*"[29]

> Under this framework, a plaintiff must first make out a prima facie case of
> discrimination, as described above.  After the plaintiff has made the requisite
> showing, the burden shifts to the defendant to articulate a legitimate,
> nondiscriminatory reason for its actions.  If the defendant proffers such a reason,

---

[26] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012).

[27] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011) (internal quotation marks omitted).

[28] *Id.* at 1038 (internal quotation marks omitted).

[29] *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely "pretextual."[30]

While there is little evidence that Plaintiff was terminated because of her alleged disability, the Court will assume for purposes of summary judgment that Plaintiff has presented a prima facie case of discrimination.  Thus, the burden shifts to Delta to show legitimate, non-discriminatory reasons for Plaintiff's termination.  Delta has met its burden by presenting evidence that Plaintiff was terminated based on the fact that she was on Final Warning, had prior occasions of absence in the twelve months leading to her termination, and failed to follow Delta's absence notification policy in relation to her June 8th absence.  Thus, the burden shifts back to Plaintiff to show that Defendant's stated reasons are pretextual.

 "To establish pretext, [Plaintiff] must present 'evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"[31]  "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, we do not look to the plaintiff's subjective evaluation of the situation."[32]

Plaintiff makes no argument that Delta's decision to terminate her employment was pretextual.  Having carefully review the record, the Court finds that there is no evidence from which a reasonable factfinder could determine that Delta's reasons for termination were a mere

---

[30] *Id.* at 1038 (citations omitted).

[31] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

[32] *C.R. England, Inc.*, 644 F.3d at 1044 (internal quotation marks omitted).

pretext for discrimination.  While Plaintiff may believe that her termination was unfair, that is not the question before the Court.  "[T]he issue is not whether the decision to terminate [Plaintiff] was wise, fair or correct, but whether [Delta] reasonably believed at the time of the termination that [Plaintiff] had violated company policy, and acted in good faith upon that belief."[33]  As set forth above, at the time of her termination, Plaintiff was on Final Warning, had occasions of absences in the previous twelve months, and failed to follow Delta's absence notification policy.  There is no evidence that these reasons were a mere pretext for discrimination.  Therefore, Plaintiff has failed to meet her burden and summary judgment is appropriate on this claim.

B.      ERISA

29 U.S.C. § 1140 provides: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ."  "To make a prima facie case of interference with ERISA benefits, [Plaintiff] must establish by a preponderance of the evidence . . . that [her] discharge was motivated by an intent to interfere with employee benefits protected by ERISA."[34]  "However, 'no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating

---

[33] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007).

[34] *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008) (internal quotation marks omitted).

factor behind the termination.'"[35]  "[T]he issue is whether she was fired to prevent her from receiving benefits."[36]

Under Delta's retirement plan, eligible employees become vested once they have three years of continuous service or if they reach age 52 while employed by Delta.  An eligible vested employee may begin receiving retirement benefits on the first day of any month after their 52nd birthday, provided they are no longer a Delta employee.  This is true regardless of whether the employee quit or was terminated.  Thus, if an employee leaves Delta after being vested, that employee is still eligible to receive retirement benefits once she turns 52.

Plaintiff was fully vested in her retirement plan when she was terminated.  Plaintiff was, and apparently still is, eligible to receive retirement benefits once she reached the age for early retirement.  Because Delta's retirement plan was frozen when Delta filed for Chapter 11 Bankruptcy, Plaintiff's retirement benefits remained the same whether she retired after her 52nd birthday or, as was the case, was terminated shortly before.  Thus, Plaintiff's termination did not alter Plaintiff's ability to receive retirement benefits, nor did it alter the benefits she could receive.

Further, there is no evidence that Plaintiff's upcoming eligibility to retire was considered in the decision to terminate her employment.  During her deposition, Plaintiff admitted that she had no evidence that she was terminated to prevent her from retiring.[37]  Ms. Gagnon and Tracy Gallegos, a Delta human resources employee, similarly testified that Plaintiff's retirement had

---

[35] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1151 (10th Cir. 2011) (quoting *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991)).

[36] *Hopkins v. Seagate*, 30 F.3d 104, 106 (10th Cir. 1994).

[37] Docket No. 21 Ex. 1, at 166:10–12.

nothing to do with the decision to terminate Plaintiff's employment.[38]  Even if Plaintiff could present a prima facie case that she was terminated in order to deprive her of retirement benefits, Delta has shown legitimate, non-discriminatory reasons for her termination and Plaintiff has failed to present evidence of pretext.[39]

Plaintiff argues that she was told at the time of her termination that she ineligible for retirement benefits.  However, her only evidence in this regard merely reiterates that Plaintiff would not be eligible for retirement at the time of her termination.[40]  This was true at the time because she had not reached the age of 52.  Plaintiff provides no evidence to refute Delta's claim that she remains eligible for retirement benefits.  Indeed, Plaintiff states that she has now applied for those benefits.  Moreover, the evidence Plaintiff points to does nothing to support her claim that she was fired to prevent her from receiving retirement benefits.  As stated, there is no evidence to support that notion.  Therefore, summary judgment is proper on this claim.

C.      FMLA

Plaintiff claims that she was terminated in violation of the FMLA because she took time off to care for her sick mother on June 8, 2012.  Plaintiff also asserts that Defendants violated the FMLA by failing to notify her that she might be entitled to FMLA coverage.  Plaintiff further

---

[38] *Id.* Ex. 6, at 156:4–7; *id.* Ex. 7, at 53:16–24.

[39] Courts apply the *McDonnel Douglas* burden-shifting framework to claims under 29 U.S.C. § 1140.  *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111–12 (2d Cir. 1988); *Gavlik v. Cont'l Can Co.*, 812 F.3d 834, 852–53 (3d Cir. 1987).

[40] Docket No. 30 Ex. K.

argues that Ms. Gagnon should be held individually liable for any FMLA violations.  Each

argument will be discussed in turn.[41]

> 1.    *Termination*

The FMLA provides that employees are entitled to take up to twelve weeks of leave "[i]n

order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son,

daughter, or parent has a serious health condition."[42]  An employer may not "interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

FMLA]."[43]  "To make out a prima facie claim for FMLA interference, a plaintiff must establish

(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer

interfered with his right to take FMLA leave, and (3) that the employer's action was related to

the exercise or attempted exercise of [her] FMLA rights."[44]

Defendants do not appear to contest the first two elements.  Therefore, the Court must

determine whether Plaintiff's termination was related to the exercise or attempted exercise of her

FMLA rights.  The Tenth Circuit has stated that "an employee who requests FMLA leave would

have no greater protection against his or her employment being terminated for reasons not related

to his or her FMLA request than he or she did before submitting the request."[45]  Thus, if an

employee's termination would have occurred regardless of the request for FMLA leave, the

---

[41] Plaintiff's Amended Complaint asserted other instances in which Plaintiff believed
Defendants violated the FMLA, but Plaintiff appears to have abandoned those claims on
summary judgment.

[42] 29 U.S.C. § 2612(a)(1)(C).

[43] *Id.* § 2615(a)(1).

[44] *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005).

[45] *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

employee may be terminated even if such termination prevents the employee from exercising his right to leave under FMLA.[46]  Further, an employee's "request for an FMLA leave does not shelter her from the obligation, which is the same as that of any other . . . employee, to comply with [an employer's] employment policies, including its absence policy."[47]

Plaintiff's FMLA claim related to her termination fails because Plaintiff would have been terminated even if her June 8th absence was considered FMLA leave.  At the time of her June 8th absence, Plaintiff was on Final Warning and had previously received occasions of absence for which she had not sought nor received FMLA leave.  With respect to her June 8th absence, Plaintiff failed to comply with Delta's absence notification policy.  The FMLA does not relieve an employee of complying with an employer's absence policy.  Thus, Plaintiff would have been held accountable for this failure regardless of whether her absence was FMLA qualifying.

Plaintiff violated Delta's absence policy when she failed to follow the requirements for those on A-Days.  Delta's absence notification policy for A-Days states: "If you call in sick on the day of the assignment after accepting the assignment . . . your schedule will be marked with CFSM and you will need to contact your Field Service Manager."[48]  Plaintiff had accepted an assignment, yet called off on the day of the assignment in violation of Delta's absence notification policy.  Because of her actions, Plaintiff received a failure to cover for which she could be terminated.

Plaintiff disputes the relevance of this provision of the absence notification policy, arguing that she did not call in sick but rather requested MTO.  MTO is an option for an A-Day

---

[46] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004).

[47] *Id.* at 878.

[48] Docket No. 21 Ex. 14.

drop without pay in certain circumstances, such as a sick family member.[49]  However, the
absence notification policy applied whenever a flight attendant was unable to cover an
assignment, regardless of the reason.[50]  Thus, the fact that Plaintiff was requesting an MTO did
not relieve her of complying with the absence notification policy.[51]  Moreover, an MTO could
still result in discipline.[52]  Thus, even if her absence was excused for some reason, Plaintiff still
had to comply with Delta's absence notification policy and her failure to do so was properly
considered in Delta's decision to terminate her.

2.     *Notice*

Plaintiff also argues that Delta failed to properly notify her that FMLA coverage may
apply.  "If the employer is on notice that the employee might qualify for FMLA benefits, the
employer has a duty to notify the employee that FMLA coverage may apply."[53]  The FMLA
does "not require a covered employee to specifically ask for FMLA benefits."[54]  Further, "[a]n
employee need not expressly assert rights under the FMLA or even mention the FMLA."[55]
However, an employer must be on notice that the employee wants leave.[56]  Merely calling in

---

[49] Docket No. 21 Ex. 21.

[50] Docket No. 34 Ex. 1-B, at 52:14–23; *id.* Ex. 1-A, at 162:14–22, 172:5–22.

[51] *See* Docket No. 21 Ex. 6, at 54:1–3 ("A managed time-out is an option employees have
if they're not going to be available to the operation, provided that they follow their work rules—
of calling in procedures.").

[52] *Id.* at 57:15–23.

[53] *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir. 2001).

[54] *Id.*

[55] *Id.*

[56] *Howard v. Garage Door Grp., Inc.*, 136 F. App'x 108, 114 (10th Cir. 2005); *see also*
29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to
reasonably determine whether the FMLA may apply to the leave request.").

sick is insufficient to provide an employer with notice under the FMLA.[57] "'The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'"[58]

The Court finds that Plaintiff failed to provide Delta with sufficient information to reasonably apprise it that she might qualify for FMLA benefits.  On June 8, 2012, Plaintiff called to request a MTO.  Plaintiff stated that her mother was sick and the she did not feel capable of flying.  Plaintiff was informed that since she was on A-Days she would need to contact her supervisor, Ms. Gagnon.  Later that morning, Plaintiff emailed Ms. Gagnon explaining that her mother was "very ill" and that she had been caring for her mother until 1:55 a.m.[59]  At that point, Plaintiff realized that she was "unfit to fly due to fatigue" and called in to request a managed time out.[60]  Plaintiff went on to state that she had made arrangements for care for her mother and "would be happy to go back on call asap to help our operations."[61]  It appears that Ms. Gagnon did not offer FMLA leave at that time, but FMLA leave was brought up later in discussions between Plaintiff and Ms. Gagnon.[62]

---

[57] *See Walton v. Ford Motor Co.*, 424 F.3d 481, 487 (6th Cir. 2005) (citing *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 981–82 (5th Cir. 1998)); *see also de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008) ("Calling in sick without providing additional information does not provide sufficient notice under the FMLA.").

[58] *Crowell v. Denver Health & Hosp. Authority*, 572 F. App'x 650, 653 (10th Cir. 2014) (quoting *Satterfield*, 135 F.3d at 977).

[59] Docket No. 21 Ex. 20.

[60] *Id.*

[61] *Id.*

[62] Docket No. 21 Ex. 22; Docket No. 30 Ex. B.

Plaintiff's phone call and later email were insufficient to trigger Delta's obligation to inform Plaintiff that FMLA coverage may apply.  Plaintiff merely stated that her mother was sick and that she, Plaintiff, was unfit to fly.  This information did not sufficiently convey to Delta that Plaintiff or her mother had a serious health condition to which FMLA leave would apply. Indeed, Plaintiff's email to Ms. Gagnon on the morning of June 8, 2012, indicated just the opposite.  Plaintiff stated that she had made arrangements for her mother's care and was ready to go back on call "asap."  Such information is insufficient, as a matter of law, to trigger Delta's notice obligations under the FMLA.

Plaintiff asserts that sometime between June 8, 2012, and June 14, 2012, she provided Ms. Gagnon a written statement from her mother detailing her mother's condition.[63]  While this letter provided more information about the situation leading to Plaintiff's June 8th absence, it did not provide sufficient information to put Delta on notice that Plaintiff may qualify for FMLA benefits.  Plaintiff's mother stated that she had various health problems and that her caregiver had a stroke on June 3, 2012.  She explained that Plaintiff was staying with her during this time. She went on to explain that Plaintiff was exhausted and should have declined the assignment for June 8, 2012.  Nothing in the letter suggested that Plaintiff needed time off under FMLA to care for her mother.  Rather, Plaintiff made clear in her earlier email to Ms. Gagnon that she was ready to go back on call as soon as needed.

Even if Plaintiff did provide sufficient information to trigger Delta's notice obligations, her claim still fails.  If an employee establishes that an employer interfered with, restrained, or

---

[63] Docket No. 21 Ex. 34.  Defendants dispute when Ms. Gagnon received the letter from Plaintiff's mother.

denied the exercise of FMLA rights, the statute "provides no relief unless the employee has been prejudiced by the violation."[64]

Plaintiff cannot demonstrate that she was prejudiced by Delta's failure to notify that FMLA coverage may apply.  The record shows that Plaintiff was familiar with the process for requesting FMLA leave, having requested it for herself and other family members.[65]  This is further evidence by the fact that Plaintiff eventually did apply for FMLA leave for her June 8th absence, although this request was eventually denied as untimely.  Finally, as discussed above, even if Plaintiff's June 8th absence was not considered, Plaintiff would have been terminated regardless.  Plaintiff was on Final Warning, she had previous occasions of absence, and failed to follow Delta's absence notification policy.  Therefore, Plaintiff cannot demonstrate any prejudice by Defendants' failure to notify her that she might qualify for FMLA.

### 3.    *Personal Liability*

Plaintiff also asserts her FMLA claim against Ms. Gagnon.  Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer."[66]  FMLA regulations provide that "individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA."[67]

---

[64] *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

[65] Plaintiff argues that she was not familiar with the process for requesting FMLA leave, but this argument is not supported by the evidence.

[66] 29 U.S.C. § 2611(4)(A)(ii)(I).

[67] 29 C.F.R. § 825.104(d).

The Tenth Circuit has not specifically addressed individual liability under the FMLA. However, a majority of the courts that have addressed the issue, including this Court, have concluded that individuals may be held liable as employers under the statute.[68]  While the question of who is subject to individual liability is less than clear, this Court has stated that "[i]ndividuals who have no corporate role beyond a managerial position are not employers under the FMLA."[69]

Here, there is no evidence that Ms. Gagnon had any corporate role beyond her position as a front-line manager.  Further, there is no evidence that Ms. Gagnon had any control over or involvement in Plaintiff's FMLA requests.  Those requests were directed to Sedgwick, Delta's third-party administrator, whose role was to grant or deny FMLA requests.  Ms. Gagnon played no part in Sedgwick's decision-making process.  Plaintiff's reliance on the Court's decision in *Pedersen* is distinguishable for these reasons.  Based upon the facts presented, there is no basis to assert individual liability against Ms. Gagnon and the Court will dismiss Plaintiff's FMLA claim against her.

D.   BREACH OF CONTRACT

Plaintiff argues that various Delta policies have created an implied employment contract. "An implied contract may arise from a variety of sources including personnel policies or provisions of an employment manual."[70]  "[F]or an implied-in-fact contract term to exist, it must meet the requirements for an offer of a unilateral contract.  There must be a manifestation of the

---

[68] *Pedersen v. W. Petroleum, Inc.*, No. 2:07-CV-997 TS, 2008 WL 977370, at *3 (D. Utah Apr. 9, 2008).

[69] *Stuart v. Regis Corp.*, No. 1:05-CV-16 DAK, 2006 WL 1889970, at *6 (D. Utah July 10, 2006).

[70] *Cabaness v. Thomas*, 232 P.3d 486, 502 (Utah 2010).

employer's intent that is communicated to the employee and sufficiently definite to operate as a

contract provision."[71]

> The existence of such an agreement is a question of fact which turns on the
> objective manifestations of the parties' intent.  As a question of fact, the intent of
> the parties is primarily a jury question.  However, if the evidence presented is
> such that no reasonable jury could conclude that the parties agreed to limit the
> employer's right to terminate the employee, it is appropriate for a court to decide
> the issue as a matter of law.[72]

The existence of "a clear and conspicuous disclaimer, as a matter of law, prevents

employee manuals or other like material from being considered as implied-in-fact contract

terms."[73]  "[W]hen an employee handbook contains a clear and conspicuous disclaimer of

contractual liability, any other agreement terms must be construed in the light of the

disclaimer."[74]

Delta's Personnel Practices Manual states:

> Just as all personnel have the right to resign their employment with Delta at any
> time and for any reason they choose, Delta may terminate the employment
> relationship with any employee at any time and for any reason.  The right exists
> notwithstanding any examples of improper conduct or other statements contained
> in any personnel handbook or manual or any other statements of Delta's polices
> or procedures.  No Delta supervisory or management personnel other than the
> President and Chief Executive Officer is authorized to amend or modify these
> terms of employment.  The President and Chief Executive Officer may make such
> an amendment or modification only through a document signed by that officer.[75]

---

[71] *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991).

[72] *Id.* at 1001.

[73] *Id.* at 1003.

[74] *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992).

[75] Docket No. 21 Ex. 35.  Plaintiff objects to the Court's consideration of this document,
arguing that this document was never provided in discovery.  However, as Defendants explain,
because of the scope of Plaintiff's discovery requests, they produced the table of contents of
employee policies to allow Plaintiff to identify which policies she wanted to request.  Docket No.
34 Ex. L, at 15.  Plaintiff apparently never made such a request.

This language clearly and conspicuously disclaims any contractual relationship.  This provision makes evident that, regardless of statements contained in any personnel handbook or manual, the employment relationship remains at-will.  Further, the policies on which Plaintiff relies do not provide evidence of an employment contract.  Without evidence from which a jury could find a contractual relationship, Plaintiff's breach of contract claim fails.

Even if Plaintiff could establish a contract, there is no evidence that Delta breached that contract.  In her Amended Complaint, Plaintiff alleged that Delta breached its sick-leave policy by penalizing her when she called in to cancel a shift more than three hours prior to that shift.  Plaintiff's argument conflates Delta's absence notification policies.  The three-hour rule cited by Plaintiff applies to trip holders.  It is undisputed that on June 8, 2012, Plaintiff was not a trip holder but was instead on A-Days and had accepted an assignment.  The A-Days policy is different from the trip holder policy and, as set forth above, Plaintiff violated that policy.

In response to Defendants' Motion for Summary Judgment, Plaintiff makes general reference to Delta's absence policies, its corrective action policy, and the appeal process provided after termination.  However, Plaintiff does not appear to argue that these policies were violated in any way, except as discussed above. Without more, Plaintiff's claim fails.

E.      BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

"An implied covenant of good faith and fair dealing inheres in every contract."[76]  "Such a covenant cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties."[77]  Thus, the covenant of good faith "cannot be construed to change an

---

[76] *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004).

[77] *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).

indefinite-term, at-will employment contract into a contract that requires an employer to have good cause to justify a discharge."[78]  Because Plaintiff has failed to establish the existence of an implied contract, she cannot establish a violation of the covenant of good faith and fair dealing.[79]

### IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 21) is GRANTED.  It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 22) is DENIED.

The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff and close this case forthwith.

DATED this 26th day of April, 2016.

BY THE COURT:

Ted Stewart
United States District Judge

---

[78] *Id.*

[79] *Tomlinson v. NCR Corp.*, 345 P.3d 523, 531 (Utah 2014).